Filed 1/28/14  In re Timothy G. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re TIMOTHY G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DIANA F., <br><br> Defendant and Appellant. | G048641 <br><br> (Super. Ct. No. DP-019675) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Deborah Servino, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the minor.

Diana F. appeals from the juvenile court's summary denial of her Welfare and Institutions Code section 388 (section 388) petition.[1] Diana contends the juvenile court abused its discretion. We conclude it did not and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

*1. The Petition*

In April 2010, Diana was arrested and incarcerated for felony child abuse. On April 14, the Orange County Social Services Agency (SSA) filed a petition on behalf of her three children, Jessica E., Danny E., and Timothy G., then eight years old, four years old, and nine months old, respectively.[2] The petition alleged Diana physically abused Jessica and Danny, the most recent incident being when Diana struck Jessica multiple times in the face with a shoe, and that Timothy was at significant risk of physical abuse.

According to the petition, Diana had unresolved anger problems, which were evidenced by her prior arrests and/or convictions for cruelty to a child, battery, exhibiting a deadly weapon, minor in possession of alcohol, the infliction of great bodily injury to a cohabitant, fraud, and contempt of court, and her rather long history of domestic violence and drug abuse. Jesse E., the father of Diana's two older children, told a social worker he and Diana had mutual restraining orders as they both had problems managing anger. The petition also alleged there had been eight prior child welfare referrals involving Diana.

The children were removed from Diana's home and initially placed in foster care. However, by the time of the contested disposition hearing in July 2010, the court had placed all three children with Jesse and his fiancé, Gina G. The court ordered family reunification services for Diana. The case plan called for Diana to engage in

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Timothy's siblings are not parties to this appeal.

counseling to "address family separation, domestic violence, communication, and parenting," to complete a parenting class, and submit to regular drug testing.

## 2. Six-month Review

In October, Diana was released from custody to a sober living facility. According to the social worker's report, Diana had weekly monitored visitation with the children, and the monitors described Diana as attentive, affectionate and loving. However, the social worker also described Diana's compliance with her case plan as "minimal," due in large part to Diana's failure to obtain the necessary referrals for counseling and drug testing.

In January 2011, at the six-month review hearing, the juvenile court terminated jurisdiction over Jessica and Danny, but continued jurisdiction over Timothy with additional reunification services for Diana. The juvenile court modified Diana's case plan to add the completion of an SSA approved drug treatment program and a treatment program for child abusers.

## 3. Twelve-month Review

Although the 12-month review was set for May 2011, it was continued several times over the following months. Nevertheless, Diana's progress with her case plan was again described as "minimal." According to the social worker's report, Diana was on probation and lived in a women's group home. She had not yet gotten a referral for counseling, nor had she completed a parenting class. Moreover, she failed to maintain contact with her social worker. For example, SSA had no address or contact number for her for over two months, and when Diana did contact SSA and schedule appointments with her social worker, she often failed to appear for the appointments.

As for her visitation, Diana had been given one, two-hour visit a week during her incarceration. She missed three visits with Timothy during one reporting period, although Diana claimed this was due to transportation problems. The visitation monitors reported that Diana generally arrived on time, stayed for the full period of time

allowed, and provided the children with food and attention, although she often engaged other parents rather than her children. The social worker noted, "She is attentive to Timothy, but at times she does not always pay attention to him and her older daughter, Jessica, will be watching and playing with Timothy."

On the other hand, Timothy was happy and healthy in Jesse's home, and seemed bonded to his new caretakers. An addendum report prepared in July 2011, more than one year from the date of initial detention, summarized the situation as follows: "The mother is not currently in a position to have the child returned to her care. The mother's current living situation is not appropriate to have her son in her care. The mother is still not employed and with all of her current requirements it would be very difficult that she could work full-time, take care of her son, and still complete her court ordered case plan . . . . There is no substantial probability at this time that the child could be returned to the mother's care." In light of Diana's performance on her case plan, SSA recommended the court continue Timothy as a dependent child of the juvenile court, terminate family reunification services to Diana, and schedule a section 366.26 permanency planning hearing.

Unfortunately, Jesse died on July 20, 2011. Initially, Timothy was placed with a different relative. However, SSA later returned him to Gina, who expressed an interest in a permanent placement. In one report, the social worker stated, "[Diana] has made some progress over the past few months, although she still . . . needs to complete a 52 week child abuse prevention class," a class that had been a part of her case plan from the beginning. The social worker also reported, "Despite many efforts and encouragement from both Social Services and Probation, [Diana] has yet to begin this requirement."

By the end of October 2011, Diana had moved into a home and she claimed to be working part time, although she would not tell the social worker how many hours she actually worked. She also submitted a declaration in a concurrent family law

4

proceeding in which she informed the court of Jesse's death and expressed the desire that the court "modify and award her sole legal and sole physical custody of" her children. She claimed to be unable to communicate with Jesse's relatives, and that she had not "seen or heard from my children since July 2011." She claimed to have "done anything and everything that the Court ordered me to do," and that she was "a much different person now tha[n] the one that once hit Jessica." She requested the court order the "Child Abduction Unit" from the district attorney's office "to locate and bring the children to me."

Diana's declaration triggered an investigation into her dependency case. The assigned social worker told the investigator that Diana was "still working a case plan" with the recommendation to terminate reunification services and plan for Timothy's adoption. The social worker reported that Diana had completed a parenting class and the drug and alcohol portion of her case plan, but she had just begun the 52-week child abuse prevention program. Furthermore, Diana had always known where her children were and how to contact their caregivers. According to the investigator, Diana had not informed the family law court of her concurrent dependency proceeding.

*4. Eighteen-month Review*

Due to numerous continuances, the juvenile court held a combined 12 and 18-month-review hearing, which began on December 6, 2011, but continued over several days in January and February 2012. At Diana's request, SSA was considering placing Timothy with his maternal grandmother, and Diana's adult daughter, Marlene F. However, Marlene had not cooperated with the SSA investigation of her home. In fact, a family squabble became so intense during the social worker's in-home evaluation the social worker felt the need to call 911. Consequently, SSA did not recommend placing Timothy in the home.

In late December, Diana unsuccessfully tried to replace her social worker. Diana and the maternal grandmother claimed the social worker had not accurately

5

reported her interview with the maternal grandmother, and the maternal grandmother filed a declaration in support of Timothy's placement in her home. Diana continued to visit Timothy, but Gina had concerns about visitation after Diana brought several toys to one visit, allowed Timothy to play with them, and then took them back at the end of the visit.

Gina's testimony lasted over two days in January 2012. In February, with the hearing ongoing, the court increased her visitation with Timothy. The social worker testified at length about Diana's performance of the case plan and her visitation with Timothy. At the time, SSA reported April 2012 as the likely date for a finalized permanent plan, two years after Timothy's initial detention. As the juvenile court stated, Diana was given essentially "two months to make a difference one way or the other."

5. *Permanency Planning Hearing*

In an April status review report, the social worker stated Diana had again moved and not immediately advised her social worker of her new residence. When the social worker finally went to Diana's new address, Diana's landlord said he wanted her to move out because she had no social skills and appeared to be taking advantage of him. Diana claimed she worked three jobs, but she would not give the social worker her employers' names or her pay stubs. She had finally enrolled in a 52-week child abuse prevention class, but had yet to complete it. As the social worker reported, "Although the mother has completed a good portion of her case plan, there is still the issue of stability and consistency." Due to Timothy's age, the length of time he had been in out-of-home placement, and the fact that his return to Diana's care in the foreseeable future seemed unlikely, SSA recommended terminating reunification services and the scheduling of a section 366.26 hearing.

In May, the parties stipulated to the termination of reunification services and the setting of a section 366.26 hearing with a permanent plan of making Gina

6

Timothy's legal guardian. Diana continued to visit Timothy, once a month for four hours.

The next status hearing occurred in February 2013. By that time, SSA recommended terminating Diana's parental rights with the permanent plan of Timothy's adoption by Gina. Timothy, by then three years old, was healthy and happy in Gina's home, and he called Gina "'mom.'"

On the other hand, Diana's visitation had become "sporadic." She struggled to make the necessary arrangements with Gina and an independent monitor, and she sometimes called at the last minute to schedule her one visit per month. Thus, the juvenile court adopted the recommendation of the social worker, and set the matter for a section 366.26 hearing in June 2013.

6. *Section 388 Petition*

On June 24, 2013, Diana filed a section 388 petition. She claimed the completion of the 52-week child abuser's treatment program, a separate parenting class, and her regular monitored visitation as evidence of changed circumstances warranting the resumption of reunification series and immediate return of Timothy to her care.

Timothy was now almost four years old, and he had spent only his first nine months in Diana's care. After reviewing the petition, supporting documents, and counsels' arguments, the court acknowledged the completion of the 52-week child abuse treatment course constituted a change. However, the court also concluded that this change did not amount to changed circumstances. For instance, Diana did not submit any evidence she had adequate living arrangements, employment, or community support to take immediate custody of Timothy.

As for Timothy's best interests, the court stated removing Timothy from Gina's custody "would probably be very detrimental to [Timothy] and shocking. He has only seen [Diana] for a very limited amount of time every two weeks now for a few years, and even in those visitations she doesn't take the full responsibility for him as a

7

mother. It's more as though she's visiting him almost as a friend or something outside of that but not as a mother role."

The court summarily denied the petition and proceeded with the section 366.26 hearing. The agency submitted on the social worker's reports. Diana and her social worker testified at the hearing. After considering all the evidence and the arguments of counsel, the court found Timothy adoptable, and that terminating Diana's parental rights was in Timothy's best interest. This appeal followed.

## DISCUSSION

A section 388 petition "is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. [Citations.]" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416; see *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*); *In re Zachary G.* (1999) 77 Cal.App.4th 799, 805, 808 (*Zachary G.*).) Under section 388, a juvenile court may modify one of its orders if the petitioner shows, by a preponderance of the evidence, that there are (1) changed circumstances or new evidence that support a modification; and (2) the modification would be in the best interests of the child. (*Stephanie M.*, at pp. 316-317; *Zachary G.*, at p. 806.)

To obtain a hearing on a section 388 petition, the petitioner needs only to make a prima facie showing of these two elements, and "the petition should be liberally construed in favor of granting a hearing to consider the parent's request. [Citation.]" (*Zachary G.*, *supra*, 77 Cal.App.4th at p. 806; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310 (*Marilyn H.*).) But the burden of showing changed circumstances is on the party seeking modification (*Marilyn H.*, at p. 309), and "if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed [modification is in] the best interests of the child, the court need not order a hearing on the petition. [Citations.]" (*Zachary G.*, at p. 806.)

Diana first claims her petition met the prima facie showing required to warrant an evidentiary hearing. Not so. Diana asserted her completion of the 52-week child abuse prevention class as a changed circumstance, and the court acknowledged the change. But, as county counsel assets, assuming Diana had completed all aspects of her three-year case plan, she had never progressed to unmonitored visitation with Timothy. In other words, she was not ready, willing, and able to care for Timothy after over two years of reunification services. Thus, the denial of her request for immediate custody of him seems eminently reasonable.

Diana claims an evidentiary hearing would have permitted her to introduce additional testimony regarding her visitation and would have allowed the juvenile court to "sort through the different version[s] of the facts, given that the social worker admitted . . . her information only came from Gina . . . ." However, the juvenile court had all the information necessary to make factual findings, and the court expressly considered all the available evidence before ruling. Moreover, the juvenile court found Diana's testimony not credible when she testified about the length, frequency, and nature of her visits with Timothy. In short, Diana failed to establish by a preponderance of the evidence that her late compliance with the case plan constituted changed circumstances sufficient to modify the court's custody order.

But even assuming we found a prima facie case of changed circumstances, Diana fails to persuade us a change in placement at this late date was in Timothy's best interest. "Family Code section 7800 declares the welfare and best interest of a child is achieved '"by providing the stability and security of an adoptive home when those conditions are otherwise missing from [the child's life]."'" [Citations.] The fact is, '[o]nce reunification services are ordered terminated, the focus shifts to the *needs of the child for permanency and stability. . . .* [¶] . . . The parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if

9

unsuccessful, the child's interest *in permanency and stability takes priority.*' [Citation.]" (*In re Ronell* (1995) 44 Cal.App.4th 1352, 1369.)

In this case, Diana had approximately three years to reunify with Timothy. Nevertheless, she repeatedly disregarded her obligation to stay in contact with SSA, obtain the necessary referrals to complete her case plan, or engage in meaningful visitation with Timothy. As the court in *In re Marilyn H.*, *supra*, 5 Cal.4th at page 310, observed, "Childhood does not wait for the parent to become adequate. [Citation.]" By the time Diana filed her section 388 petition, Timothy had spent the vast majority of his life in Gina's custody. To remove him from the only secure, stable home he had ever known would have caused chaos and uncertainty in an already uncertain life. Under the circumstances presented in the record, the juvenile court did not abuse its discretion by summarily dismissing Diana's section 388 petition.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.